## MARTHA B. STEVENS

*v.*

## WILLIAM W. SHIPPEN and others.

28  487<br>64    9

1. A resolution of congress released and conveyed to the heirs at law of Robert L. Stevens, deceased, or their legal representatives, all the right, title and interest of the United States in and to the Stevens Battery, a vessel which, at the time of Robert L. Stevens's death, was being constructed by him for, and under contract with, the United States government, and on which he had expended a large sum of his own money—*Held*, that congress thereby intended merely to release any right or claim which the government might have to the vessel, and that any title which, by the terms of the resolution, passed to the heirs at law of Robert L. Stevens, or their legal representatives, would be held by them in trust for the residuary legatee, under the will of Robert L. Stevens, to whom it would have gone had Robert L. Stevens owned it at his death.

2. The direction by Edwin A. Stevens, by his will, that the battery be finished by his executors in a certain way, and at a cost not to exceed a certain amount, and when finished to be offered to the state of New Jersey as a present, to be disposed of as the state shall deem proper, is an absolute gift of the vessel to the state.

3. A provision for establishing an institution "for the benefit, tuition and advancement in learning of the youth residing from time

32

to time hereafter in the state of New Jersey," is a charitable trust which will be enforced. The admission of non-resident pupils, if it be to the advantage of the trust and will not deprive any pupil resident in this state or any person resident in this state entitled to be and desirous of being a pupil, of the benefit of the trust, will not be restrained by this court.

4. A devise to executors as trustees, of certain school-houses and furniture, and the land whereon the houses stand, for the sole use and purpose of furnishing there a free, plain and practical English education to such of the children residing within the boundaries of the city of Hoboken from time to time as the authorities of that city, or such other authorities as shall at any time have the legal power over the common schools in the boundaries of the city as they existed at the time of the testator's death, shall permit to go there for that purpose, is a valid gift, and a charitable use is thereby created.

5. A provision for children who may be born after the making of the will, will prevent the operation of the 21st section of the act concerning wills upon the provisions of the will for the other children of the testator.

On original and supplemental bills and cross-information and answers and proofs.

*Mr. I. W. Scudder*, for executors of Edwin A. Stevens, deceased.

I. The title to the battery became vested in Edwin A. Stevens, and passed under his will.

This is shown by the history of congressional legislation. This history will show the intention of congress.

April 14th, 1842. "An act authorizing the construction of a war steamer for harbor defence (*p.* 54, *l.* 30).

Authority given to contract with Robert L. Stevens.

February 10th, 1843. Contract between Abel P. Upshur, secretary of the navy, and Robert L. Stevens (*p.* 26, *l.* 14; *p.* 71).

November 14th, 1844. Contract between John Y. Mason, secretary of the navy, and Robert L. Stevens (*p.* 55, *l.* 30; *p.* 74).

December 11th, 1844. Understanding explanatory of the contract with R. L. Stevens.

R. L. Stevens's letter to J. Y. Mason, and Mason's order (*pp.* 82, 83).

December 12th, 1844.    C. Morris to Samuel Hartt, naval constructor (*p.* 84).

December 9th, 1845.    Work suspended on the battery (*p.* 27).

August 20th, 1846.    Robert L. Stevens made his will, and gave his residuary estate to Edwin A. Stevens (*p.* 27, *l.* 35).

January 18th, 1847.    Robert L. Stevens applied for an extension of time to complete battery (*p.* 27, *l.* 4).

September 9th, 1848.    Another contract between secretary of navy and Robert L. Stevens (*p.* 27, *l.* 10; *p.* 56, *l.* 20).

1848.    Work on battery resumed (*p.* 27, *l.* 13).

February 13th, 1849.    C. W. Skinner, about daily charge for wages (*p.* 84).

February 13th, 1849.    John Y. Mason—letter of Robert L. Stevens referred to, and certain matters approved (*p.* 85).

1849.    Work on battery suspended (*p.* 27, *l.* 14).    Government refused to pay for materials and labor.

January 1851.    Navy department insisted contract was void.

1853.    Work resumed on the battery (*p.* 27, *l.* 21).

1855.    Work suspended on the battery (*p.* 27, *l.* 20).

1856.    Robert L. Stevens died (*p.* 27, *l.* 23).

At the time of his death, expended on battery by
government.............................................. $500,000
By R. L. Stevens...................................... 113,579
                                                        ———————
                                                        $613,579

*The right to this* $113,579, *expended on the vessel, passed under the residuary clause of the will;* it passed to *Edwin A. Stevens.*

*Edwin A. Stevens* went on with the work on the battery, and

September 5th, 1857, had expended of his own money, $89,185, W. W. Shippen's testimony, (*p.* 143, *l.* 37.)

*This shows Edwin A. Stevens's construction of the will of Robert L. Stevens* (*p.* 28).

Robert L. Stevens had expended...................... $113,579

Edwin A. Stevens........,.............................:...... 89,185

February, 1862. Edwin A. Stevens presented a memorial to congress praying that an appropriation might be made to complete the vessel.

See exhibit which contains the report of Stringham, Inman, Dornin and Steimers, to Gideon Welles, secretary of navy, dated December 24th, 1861 (*p.* 28, *l.* 29).

12 *U. S. Stat. at Large, p.* 380. An act making additional appropriations for the naval service for the year ending June 30th, 1862. Approved April 17th, 1862.

April 17th, 1862. This act appropriates $783,294.

Read section 2. The money expended by Edwin A. Stevens referred to. Contract with Edwin A. Stevens contemplated. Secretary of Navy did not enter into the contract.

July 17th, 1862. Approval of joint resolution of congress releasing to heirs at law of Robert L. Stevens or their legal representatives, Stevens Battery. 12 *Stat. at Large, p.* 628. (*Case, p.* 29, *l.* 20.)

Secretary of navy would not contract with Edwin A. Stevens under act of April 17th, 1862. Hence this joint resolution.

At this time Edwin A. Stevens was in possession of the battery. He was entitled to the money claim of $113,579 of Robert L. Stevens against the government; his own claim of $89,185. He was the sole residuary devisee of Robert L. Stevens. Edwin A. Stevens's claim had been alluded to in the act of congress of April 17th, 1862. W. W. Shippen. (*p.* 134.)

The construction of the joint resolution—

1. On the 17th of July, 1862, Edwin A. Stevens was in possession of the battery, claiming a right by lien thereon.

2. He was the residuary legatee of Robert L. Stevens, the constructor, and as such residuary legatee he asked congress to make an appropriation to enable him to complete the battery; and congress responded by making such appropriation on the 17th of April, 1862, but a discretion was

Stevens *v.* Shippen.

allowed the secretary of the navy, and the secretary refused to allow the money to be expended.

3. Edwin A. Stevens accepted the release, and took possession under the release ; and remained in undisputed possession, and as avowed owner of the battery, to the time of his death ; and after making repeated efforts to dispose of the battery, bequeathed the same by his will.

4. The language, " all the right, title and interest of the United States " be " released," indicates that there was a title in some one else, and that the right and title of the United States was to be relinquished to a party having some title.  On the 17th of July, 1862, the heirs at law of Robert L. Stevens had no title.

5. The clear intention of congress, as drawn from previous legislation and the acts of the government, pointed to Edwin A. Stevens.

6. The government, by this release, intended to extinguish the claims of Robert L. Stevens and Edwin A. Stevens. See act of congress, April 17th, 1862.   12 *Stat. at Large,* p. 380.

7. The joint resolution must be construed by the intention, for the words *heirs at law,* as applied to the battery, were not used in their *technical sense.*

Congress has given a legislative construction to the resolution of July 17th, 1862, by the resolution of July 1st, 1870. 16 *Stat. at Large, p.* 383.

*Whereas, Edwin A. Stevens,* who was in his *life-time the owner of* the ship known as the Stevens Battery, originally commenced under contract for the United States government *and upon the building of which large sums of money were spent by his brother and himself,* did, by his last will and testament, (the United States having previously relinquished all claims to said ship,) leave the same to be finished by his executors, at an expense not exceeding the sum of one million of dollars, *and when finished to be offered to the state of New Jersey, as a present,* to be by her received and disposed of as the state should deem proper ; and whereas, doubts have been suggested as to the right of the state to accept said bequest without the consent of congress, under the prohibition of the tenth

Stevens v. Shippen.

section of the first article of the constitution of the United States; therefore,

*Resolved*, by the senate and house of representatives of the United States of America, in congress assembled, That the consent of congress is hereby given that the state of New Jersey shall receive and dispose of said ship according to the terms and conditions of said bequest. Approved July 1, 1870."

The legislature of New Jersey has given a construction to this will on the point of ownership.

April 1st, 1869. Joint resolution of New Jersey legislature—state would accept vessel when the same should be finished and offered to the state (*p.* 32, *l.* 27; *p.* 44).

Commissioners appointed—Fitz-John Porter, Benjamin G. Clarke, William W. Shippen.

"Whereas, by the last will and testament of the late Edwin A. Stevens, deceased, the vessel known as the Stevens Battery," &c., (*p.* 44.)

March 21st, 1871. Joint resolution of the New Jersey legislature authorizing sale of the battery (*p.* 35, *l.* 20; *p.* 46; *P. L.* 1871, *p.* 133).

II. The heirs at law of Robert L. Stevens are estopped from asserting any title.

Robert L. Stevens died in 1856.

On the 12th of April, 1872, the bill was amended to bring in the heirs at law of Robert L. Stevens (*p.* 92) after a lapse of sixteen years. They acquiesced in the taking possession by Edwin A. Stevens. In the expenditure of $89,185 by Edwin A. Stevens (*p.* 28). In the resolution by congress of July 1st, 1870, authorizing the state to take the battery in which Edwin A. Stevens was named as owner. The will of Edwin A. Stevens. The efforts of Mr. Stevens to sell the battery. The expenditure by the executors of $885,943.39 (*p.* 54, *top*). The resolutions of the state of New Jersey. *Erie County Savings Bank* v. *Roop*, 48 *N. Y.* 298; *Gregg* v. *Wells*, 10 *Ad. & El.* 90; *Tilton* v. *Nelson*, 27 *Barb.* 602.

*The King* v. *The Inhabitants of Butterton*, 6 *T. R.* 556. Lawrence, J. "I remember a case, some years ago, in

Stevens *v.* Shippen.

which Lord Mansfield would not suffer a man to recover even in ejectment, where he had stood by and seen the defendant build on his land." This case cited with approval as an estoppel in equity, in *Storrs* v. *Barker,* 6 *Johns. Ch.* 168.

III. There was sufficient to put the heirs of John Stevens on inquiry.

The title was known to be in the government of the United States. Under such circumstances the resolutions of congress were notice. This resolution was July 16th, 1862. On the 12th of April, 1872, the bill was amended. They knew of the death of Robert L. Stevens in 1856. They knew of his death—of his will.

August 7th, 1868. Edwin A. Stevens died. They knew of his death. They knew of his will which was admitted to probate. *Smith on Real and Personal Property,* 690.

As to constructive notice, whatever is sufficient to put a person of ordinary prudence on inquiry, is constructive notice of everything to which that inquiry might have led. 2 *Spence's Eq. Juris.* 755–760; *Coote on Mortgages* (3d ed.), 372; 2 *Hare & Wallace Lead. Cas.* 160, *Note to Le Neve* v. *Le Neve.*

IV. If the resolution of July 17th, 1862, should be construed literally as a conveyance to the heirs at law of Robert L. Stevens, the battery would be subject to the lien for the money expended by Robert L. Stevens, Edwin A. Stevens, and the executors of Edwin A. Stevens.

By Robert L. Stevens.................................. $113,579 00
By Edwin A. Stevens (*p.* 126, *l.* 19)................ 89,185 37
Paid by Executors (*p.* 200).......................... 722,229 73

Whole amount of lien................................ $924,994 10

The $113,579, which was a lien in favor of Robert L. Stevens, passed under his will to Edwin A. Stevens.

2 *Spence's Eq. Juris.* 803. If a person being entitled to an estate stands by, without interference, whilst another innocently builds or makes improvement on the land, thinking that he has a title to it, the person making such improve-

ment will be entitled to compensation. *Shine* v. *Gough*, 1 *Ball & Beatty*, 444; *Lord Cawdor* v. *Lewis*, 1 *Y. & C. Exch.* 432; 3 *Hare & Wallace Lead. Cas.*, *Earl of Oxford's Case*, *p.* 519.

"And it is applicable, it seems, even where the owner of the property is a *feme covert.* Thus, in the case of *Peterson* v. *Hickman*, cited in the principal case, where the husband made a lease of the wife's land, and the lessee, being ignorant of the defeasible title, went to great expense in building upon the land, the wife having, upon the husband's death, avoided the lease at law. She was compelled, in equity, to yield a recompense for the buildings and improvements upon the land." *Mickles* v. *Dillaye*, 17 *N. Y.* 86, 87.

A party in possession under a warranty deed, made valuable improvements, without knowledge that he was simply a mortgagee in possession, and, having the title of a mortgagee, is entitled to compensation for such improvements against the mortgagor. *Benedict* v. *Gillman*, 4 *Paige* 58; *Story's Eq.* § 1237.

V. The bequest of the battery to the state was conditional.

"Out of the *residue* of my estate (excluding Castle Point and the homestead lot and the house thereon), *remaining* after the payment of my debts, the said eight hundred thousand dollars in legacies, and the appropriation of so much thereof as is necessary to answer the foregoing charitable bequests and devises, *I empower my executors to apply* not *exceeding the sum of one million dollars, to finish*, on my general plans, *as near as may be*, in the discretion of my said executor, the battery known as the Stevens Battery; and for the accomplishment of the said object I give to them the use of the dock and yards and basin heretofore appropriated to the said battery, and all the material provided for the said battery. *When the said battery shall be finished*, I direct my executors *to offer* the same to the state of New Jersey, *to be disposed of* as the state shall deem proper; and if not *accepted* by the said state, I direct my executors to sell the same, and the proceeds thereof shall fall into the residue of my estate." *Will, p.* 9.

1. This is a legacy of a specific chattel. It is not money.

2. If there was no residuary estate out of which the fund could be raised to finish the vessel, it would not have passed

under the will.   He did not intend to give an *unfinished* vessel to the state.

3. When the battery was *finished*, it was to be offered to the state.   An *unfinished* vessel would have been of no use to the state.   The state could not finish the vessel.   The state could not appropriate money for that purpose.

4. The intention of the testator can only be ascertained by looking at the situation from his stand-point.

On the 14th of April, 1841, congress authorized the construction of a war steamer for harbor defence.   Edwin A. Stevens saw his brother, Robert L. Stevens, from that time to the time of his death, devote his energies and his money to this work.   Robert L. Stevens, in this country and in Europe, was regarded as far beyond his time in his knowledge on this subject.   He had tested the power of iron plate to resist shot.   Robert L. Stevens died in 1856, and Edwin A. Stevens endeavored to carry out his brother Robert's views.   Edwin A. Stevens asked congress to complete the vessel.   In 1861, there was a report of a board of examiners against completing the vessel.   It resulted, in July, 1862, in a relinquishment of the vessel by congress. Edwin A. Stevens made a codicil to his will in 1867.   He then went to Europe, and wanted to sell the battery to a foreign government.   His aim was, that the genius of his brother should be illustrated by the vessel.

Under such circumstances, his intention was to give a *completed* vessel to the state of New Jersey, to be disposed of by the state.   The state could dispose of the *completed* vessel to the government of the United States.   The government of the United States had refused to complete the vessel.

The vessel could remain in the harbor where she was built, as a memorial of Robert L. Stevens.   1 *Spence's Eq. Juris.* 557.

It being, then, the object to ascertain the meaning of the words as used, the judge or a jury can hardly be in a condition to do this, and to apply the words used to the proper

subject and the proper object, and in the proper way, unless they can be placed, as it were, in the position of the parties who used the words. Accordingly, it is the settled rule, as regards a will, where the meaning of the terms is not positively fixed, that evidence may be given as to all the surrounding circumstances which influenced the mind of the person who executed the instrument; just as, to understand the meaning of any writer, we must first be apprised of the persons and circumstances that are the objects of his allusions and statements. Indeed, it is laid down as the duty of the court to make all proper inquiries for this purpose.

Thus the state of the testator's funded property may be resorted to in order to show whether a bequest of stock is pecuniary or specific. *Attorney-General* v. *Grote*, 2 *Russ · & M.* 699.

In order to discover the intention of the testator, the court may put themselves in the place of the party, and see how the terms of the instrument affect the property or subject matter. With this view evidence is admissible of all the circumstances surrounding the author of the instrument. *Leigh* v. *Savage*, 1 *McCart.* 133, *Green, C.; Van Winkle* v. *Van Houten*, 2 *Gr. Ch.* 186; *White* v. *Executors of Olden*, 3 *Gr. Ch.* 362; *Anderson* v. *Ayres*, 1 *Hal. Ch.* 353; *Snyder* v. *Warbasse*, 3 *Stock.* 466.

The vessel could not be completed for $1,000,000, (*p.* 119, *l.* 10,) Samuel B. Dod. William W. Shippen (*pp.* 138, 139). Report of McClellan and Newton (*p.* 34, *l.* 35).

5. The state has not *accepted* an *unfinished vessel*. The state has not declared she would accept an unfinished vessel.

(*P.* 32.) Proffers to state *as soon as it shall be finished.* March 15, 1869 (*p.* 43).

April 1st, 1869. Joint resolution of the state of New Jersey (*p.* 32, *l.* 27; *p.* 44).

State will accept when *finished* and *offered.*

July 1st, 1870. Joint resolution of congress, consent that the state of New Jersey shall receive and dispose of the said ship according to the terms and conditions of said bequest.

Stevens *v.* Shippen.

6. The finishing the vessel was a *condition precedent* to the vesting of the legacy.

VI. The executors have done their duty as to the battery. August 7th, 1868, Edwin A. Stevens died.

As to battery. Samuel B. Dod's understanding of the plans of Mr. Stevens for the construction of the battery (*p.* 112).

The executors advised with Joseph P. Bradley, counselor. His advice: "That we were obliged to go on and complete the battery, whether the state would accept it or not." W. W. Shippen. (*p.* 116, *l.* 18; *p.* 135, *l.* 11.)

Executors called in Gen. George B. McClellan and Isaac Newton (*p.* 113, *l.* 18, 31; *p.* 114, *l.* 1).

Gen. McClellan, because he had become familiar with Mr. Stevens's views. (*See p.* 168.)

Letter by Gen. McClellan to Prussian, Russian and Austrian governments.

(*P.* 173, *Ex. C* 10.) Statement made by Gen. G. B. McClellan and Isaac Newton to W. W. Shippen and S. B. Dod, at meeting in February, 1869. Estimate of cost of completion, $1,000,000 (*p.* 115, *l.* 7). Evidence in relation to this exhibit (Dod's testimony, *p.* 183; *p.* 117, *l.* 20, *to end of page*).

(*P.* 111, *l.* 30.) June, 1869. Executors and two commissioners appointed by governor, and governor present at meeting (*pp.* 11, 185).

(*P.* 119, *l.* 1.) Governor and commissioners advised McClellan's plan.

(*P.* 119, *l.* 13.) September 11th, 1871. Amount expended on battery, by executors, $874,329.27.

(*Ex. C* 12, *p.* 188.) George B. McClellan to W. W. Shippen—$1,000,000 would not complete the vessel. December 4th, 1870.

(*P.* 120, *l.* 1, *&c.*) Would cost $325,000 more than a million to complete the vessel.

(*P.* 139, *l.* 20.) W. W. Shippen—Would cost $400,000 or $500,000 to complete the vessel.

VII. The charitable devises and bequests were lawful, and the manner in which they have been carried into effect has been just and legal, and there is no necessity, on the part of a court of equity, to change the manner of administering these trusts. Will, (*pp.* 6, 7, 8, 9.) Supplemental bill, (*pp.* 24, 25, 26.) Answer of W. W. Shippen and S. B. Dod, (*pp.* 52, 53.) S. B. Dod's testimony, (*p.* 107.)

The statute of 43 Elizabeth, called the Statute of Charitable Uses, has not been enacted in the state of New Jersey. We have no Mortmain statute. The only questions involved are, whether the devises and bequests are for proper objects, such as would be approved among an enlightened and Christian people, and are the trusts sufficiently definite to be carried into effect. 2 *Kent,* 285 ; *McBride* v. *Elmer,* 2 *Hal. Ch.* 108, *Brief of Henry W. Green ; Norris* v. *Thomson,* 4 *C. E. Gr.* 312 ; *Vidal* v. *Girard,* 2 *How.* (*S. C.*) 195, *Opinion of Mr. Justice Story* ; *Executors of Voorhes* v. *Executors of Voorhes,* 2 *Hal. Ch.* 511, *Brief of William L. Dayton, and decree of court.*

In the case of Mr. Stevens's will, the executors are the trustees, and there can be no difficulty on that point. The trustees can direct to whom the tuition shall be entirely free, and who shall pay. This cannot avoid the charity. A parent that is able, gives entire support to his child, and also pays for his education. To afford the means to facilitate education, without giving entire support and education to the beneficiary, would probably be the most beneficial exercise of charity.

The opinion of the court in *Attorney-General* v. *Moore's Executors,* 4 *C. E. Gr.* 506, is sufficient to settle this case. If the objects of the charity are lawful, and the trust is sufficiently definite to be carried into effect, and trustees have been appointed, a court of equity does not interfere except to correct the abuse of the trust. There has been no abuse of the trusts. The trusts of Mr. Stevens's will are valid, independent of the statutes of Elizabeth, by the common law. *Girard Will,* 2 *How.* (*S. C.*) 194.

In the case of the institution founded by Girard, it was not a free school. It was confined to a particular class. They were poor white male orphans, between the ages of six and ten years. *Vidal* v. *Girard's Executors*, 2 *How.* 131.

Opinion of Justice Story in that case (*p.* 201): "And in America, it has been thought, in the absence of any express legal prohibitions, that the donor might select the studies, as well as the classes of persons who were to receive his bounty," &c.

Mr. Stevens's will provides for a building "*suitable* for the uses of an institution of learning" (*p.* 8, *l.* 13). The institution was designed "for the benefit, tuition and advancement in learning of the youth residing from time to time hereafter within the state of New Jersey." The plan of the institution was not to establish a free school.

The statute of 43 Elizabeth expressly provides for "schools of learning." 2 *Coke's Inst.* 707, "That the commissioners empowered by the lord chancellor shall inquire," &c., "as to the lands," &c., "given by well-disposed people for relief of aged, impotent and poor people; for maintenance of sick and maimed soldiers and mariners, *schools of learning*, free schools," &c. 2 *Roper on Leg.* 1115, 1116.

A reference is made to the act entitled "An act to incorporate the Stevens Institute of Technology," approved February 15th, 1870. (*P. L., p.* 166; *supplemental bill, p.* 24, *l.* 30.)

The legislature of Pennsylvania, in the case of the Girard will, passed enabling acts giving power to the city of Philadelphia to execute the trusts. 2 *How.* (*S. C.*) 138; *Hadley* v. *Hopkins*, 14 *Pick.* 240, 253.

It is a rule in equity that a gift of real or personal estate, either *inter vivos* or by will, to promote education, is a charity. 2 *Redfield on Wills, pp.* 803, 804, § 60.

*Coggeshall* v. *Pelton*, 7 *Johns. Ch.* 292. A gift to the town of New Rochelle for the express purpose of building or erecting a town-house for transacting town business—held, to be

a good trust. Yet the town might be compelled to purchase the land, and would be obliged to maintain the building.

*Pickering* v. *Shotwell*, 10 *Penn. St. R.* 23. A bequest to be applied under the direction of the Society of Friends, for the distribution of good books among poor people—held, valid.

*Attorney-General* v. *Lord Londsdale*, 1 *Sim.* 108 (2 *Eng. Chan. Rep.* 109). By the vice-chancellor. " The institution of a school for the sons of gentlemen is not, in popular language, a charity ; but in view of the statute of Elizabeth, all schools for learning are so to be considered ; and on that ground no objection can be made to the trusts of the deed of 1697."

The case of *Attorney-General* v. *Clapham*, 2 *Vern.* 387, was put on this ground by the lord keeper : " This not being a free school is not a charity within the provisions of the statute of Queen Elizabeth, and consequently the inhabitants have not the right to sue in the name of the attorney-general."

This case does not apply, because the " institution of learning" in the Stevens will does not fall within the class of free schools. It only holds that the name of the attorney-general could not be used. The note to the case shows that the lord keeper recommended it to the parties to submit the matter to the attorney-general. The case of the Stevens will is not brought before the court at the instance of the attorney-general.

The trust was definite, and could be carried into effect. It has been carried into effect. There is nothing in the devise and bequest contrary to the law or policy of the state of New Jersey.

Though the statute of Elizabeth is not in force in New Jersey, the trust is within the language and purpose of that statute. This court will not declare that the trustees have departed from the line of their duty.

VIII. As to the four plots. They went to John, Edwin, Robert and Albert Bayard, the four sons born when the will

Stevens v. Shippen.

was made, and Richard, who was born afterwards, must be excluded.

"My executors shall divide Castle Point, and the homestead lot and houses thereon, into *four convenient plots;* they shall not make the said plots of equal value, and my wife shall determine which *one* of my *sons* shall have the plot on which my mansion-house stands; the other *three* plots my executors shall set off, one to each of my three sons other than the one to whom the mansion-house plot is assigned by my wife; the estate of each son in said plot shall be a fee simple." (*p.* 6.)

"The rest and residue of my estate, both real and personal, whatsoever and wheresoever the same may be, subject to the devises and bequests in this codicil, and of course excepting out of Castle Point and the homestead lot and the houses thereon, I give, devise and bequeath (instead of the devise and bequest of the residue of my original will) unto my said wife and children born and *to be born,*" &c. Residuary clause, (*p.* 10, *l.* 36.) Supplemental bill, (*p.* 23, *l.* 30.)

Richard Stevens born after codicil. The birth of Richard, after the execution of the codicil, does not revoke the will.

*Nix. Dig.* 1031, § 20. "Every last will and testament made when the testator had no *issue* living," &c. This not applicable. The testator had issue living, and after-born issue was provided for.

*Nix. Dig.* 1031, § 21. An after-born child comes in "if neither provided for by settlement, nor disinherited by said testator," &c.

The revocation by birth of an after-born child, is based on the principle of revocation by presumption. It is an implication or presumption of law. If the testator makes provision for children born after the execution of the will, the presumption fails.

The word *settlement* in the statute is answered by the word *will.*

The residuary clause gives to the children born and to be born, to the sons two shares each (*p.* 10, *bottom; p.* 11, *top*).

How wills are revoked. *Nix. Dig.* 1028, § 2. This copy of 29 *Car. II.* 3 *Bacon's Abridg., Wills, J.*

1 *Jarman on Wills* 106, *ch.* 7. "Nor did the birth of a child alone revoke a will made after marriage, since a married

testator must be supposed to contemplate such event; and the circumstance that the testator left his wife *enceinte*, without knowing it, was held not to impart to the posthumous birth any revoking effect." *Citing Doe* v. *Barford*, 4 *M. & S.* 10; 2 *Greenl. Evid.* § 684.

1 *Jarman* 109, *ch.* 7. " Marriage and the birth of issue do not, in regard to such wills, absolutely, but merely presumptively, produce revocation, and the presumption may be repelled by circumstances demonstrative of a contrary intention on the part of the testator. The best possible evidence of this is a provision, in the will itself, for the future wife and children, which, whatever its amount, unequivocally shows that the testator contemplated the possibility of his standing in the marital and parental relations."

In the ecclesiastical courts it was held, that " the will remained unrevoked where the wife and children were provided for by *settlement.*"

The British act of 3d July, 1837, 7 *Will. and* 1 *Vic., Ch.* 26. *Appendix to* 2 *Jarman on Wills, p.* 752, 760, ¶ 19 *of Statute.* " That no will shall be revoked by any presumption of an intention on the ground of an alteration in circumstances."

*Tomlinson* v. *Tomlinson*, 1 *Ashm.* 224. The birth of a child after the making of a will, not provided for in such will, was of itself a revocation of such will, under the act of 1794.

*Pl.* 21 *of the Statute of Wills, Nix. Dig.* 1031, was passed. 28th December, 1824. *Harrison's Compilation, p.* 90. A supplement to an act concerning wills, passed November 16th, 1795.

This act is to be construed with reference to all its provisions.

Sec. 1. Where a will is made when "no issue living, wherein any issue he might have is not provided for or mentioned."

Sec. 2 relates to after-born children after will made, and not provided for by any *settlement.*

It had been previously decided by the English courts, that a settlement would obviate the presumption of revoca tion by reason of children born after the making of a will, because such children were provided for by settlement.. *Bacon's Abridg., Wills,* § 7, *G,* "*Revocation by Change of Circumstances;*" *Kenebel* v. *Scrafton,* 2 *East* 530.

The testator made a *will,* and provided for children of B, with whom he cohabited, and afterwards married B. Such marriage and birth of children after the will, not a revocation, because of the provision by the will. 7 *Ld. Ellenborough, Opinion, p.* 539, *&c.*

1 *Redfield Ch.* 7, "*Revocation of .Wills,*" *p.* 295, *note.* "It seems to us that in this class of cases the instrument whereby such issue is provided for after the death of the testator, may justly be regarded as of a testamentary character, and virtually forming a part of the testamentary act," &c.

The case of *Kenebel* v. *Scrafton,* 2 *East* 541, puts the ground thus: "But on whatever grounds this rule of revocation may be supposed to stand, it is on all hands allowed to apply only in cases where the wife and children, the new objects of duty, are wholly unprovided for, and where there is an entire disposition of the whole estate to their exclusion and prejudice."

The whole object of the act of December 28th, 1824, was to provide for after-born children not previously provided for, either by settlement or by will. The attention of the draftsman of the act had been called to the cases in which a previous settlement providing for children to be born overturned any presumption of revocation by the birth of children after the execution of the will, which after-born children were not provided for by the will.

3 *Rev. Stat. N. Y., p.* 145, § 44. "Whenever a testator shall have a child born after the making of his will, either in his life-time or after his death, and shall die leaving such child so after-born unprovided for by any settlement, and neither provided for nor in any way mentioned in his will, every such child shall succeed to the same portion of the

father's real and personal estate as would have descended or been distributed to such child if the father had died intestate, and shall be entitled to recover the same portion from the devisees and legatees in proportion to and out of the parts devised and bequeathed to them by such will.

On this point I have no instructions from any of the parties, and have gone into the matter because it is a question involved.

*Mr. Walter L. Clarkson,* of New York, for the heirs of Robert L. Stevens, deceased.

The foundation of the claim of the heirs at law of Robert L. Stevens is the following resolution of congress :

"A resolution releasing to the heirs at law of Robert L. Stevens, deceased, all the right, title and interest of the United States in and to Stevens Battery.

"*Resolved,* by the senate and house of representatives of the United States of America, in congress assembled, That all the right, title and interest of the United States in and to Stevens Battery be and the same are hereby released and conveyed to the heirs at law of the said Robert L. Stevens, or their legal representatives. Approved July 17th, 1862.". (*Case, p.* 29.)

I. What were the rights of the United States ?

II. What are the rights of the heirs at law under the said resolution of congress ?

I. The rights of the United States arose as follows : By an act of the congress of the United States, approved April 14th, 1842, entitled "An act authorizing the construction of a war steamer for harbor defence," it was enacted :

"That the secretary of the navy be and he is hereby authorized to enter into contract with Robert L. Stevens for the construction of a war steamer, shot and shell proof, to be built principally of iron, upon the plan of said Stevens ; provided that the whole cost, including the full armament, engines, boilers and equipments, in all respects complete for service, shall not exceed the average cost of the steamers Missouri and Mississippi," (*Case, p.* 54,) viz., $586,717.84 (*Case, p.* 79).

A contract was accordingly entered into, bearing date the 10th of February, 1843, between Abel P. Upshur, secretary

Stevens v. Shippen.

of the navy, of the one part, and said Robert L. Stevens of the other part. And, as this contract was found to be "too loose and indefinite," a second contract was made, dated the 14th day of November, 1844, between John Y. Mason, secretary of the navy, of the one part, and Robert L. Stevens of the other part. And a third contract was made between the latter parties, the 9th day of September, 1848, merely to extend the time for completing the vessel four years.

In the contract dated the 14th day of November, 1844, there is this agreement:

"And it is hereby further stipulated and agreed, that the said Robert L. Stevens, in lieu of other security for the faithful performance of this contract on his part, shall make to the United States a good and sufficient mortgage, which cannot in any way be affected by previous mortgages or by previous judgments against the said Stevens, on all the land, docks, wharves, ships, and all their appurtenances, belonging to and embraced within the establishment at Hoboken, New Jersey, at which the said war steamer is to be constructed, with ample power to enter upon and sell the same, in case of failure on the part of the said Stevens to fulfill his part of this contract and that of which this is explanatory, or so much thereof as shall be necessary to complete any deficiencies on the part of the said Stevens." (*Case, p.* 78.)

Said mortgage is recorded in the office of clerk, at Hudson City, *Liber* 5, *p.* 232.

The contract also contains the following stipulation:

"The said Robert L. Stevens and John Y. Mason, as secretary of the navy department of the United States, do further stipulate and agree that the secretary of the navy shall appoint, and the said Stevens shall admit within his establishment for building said war steamer, some person or persons whose duty it shall be to attend at the works of the said Stevens, or where the said war steamer, engines and machinery are to be built, and to receive and receipt for, on account of the navy department of the United States, all materials of every description which shall be delivered therein for constructing the said war steamer, her engines, boilers, and all their dependencies; which materials, when so received and receipted for, shall be distinctly marked with the letters 'U. S.,' and shall become the property of and belong to the United States." (*Case, p.* 77.)

It cannot be denied, then, that the United States, by the express agreement, owned all the materials thus delivered for the construction of this war steamer, and had a mortgage, with power of sale, " on all the land, docks, wharves, ships, and all their appurtenances, belonging to and embraced within the establishment at Hoboken." *Scudder* v. *Calais Steamboat Co.*, 1 *Cliff.* 370.

These rights continued in the United States until "released and conveyed" by said resolution of July 17th, 1862, to " the heirs at law of said Robert L. Stevens or their legal representatives."

II. What are the rights of the "heirs at law or their legal representatives," under this resolution or private act of congress ?

1. Does the term " heirs at law or their legal representatives" mean a particular legatee, and is it indefinite as designating grantees?

2. Can any money spent subsequently upon the battery affect this mortgage given to the United States, and assigned to the heirs by this resolution—and does it cover improvements ?

3. Can the doctrine of merger apply ?

4. What is the effect of the law of July 1st, 1870 ?

5. Have any of the heirs at law been guilty of laches?

6. Is this a gift to the heirs as joint-tenants, and to a class as such ?

7. The gift is to the state of New Jersey *when* finished, (*Case, p.* 9).

8. Is the legacy to the state of New Jersey a specific legacy?

9. The money paid by the United States must be returned.

10. The executors of Edwin. A. Stevens, having converted to their own use the property of the other heirs, must also account for the value of said property from the time of such conversion.

1. There is nothing on the face of the resolution of July 17th, 1862, to excite doubt; there can, therefore, be no

patent ambiguity.   And there are not two sets of "heirs at law or their legal representatives" that claim this gift; there is, therefore, no latent ambiguity.   *Grant* v. *Naylor,* 4 *Cranch* 235.

But, it is claimed, because Robert L. Stevens left his interest in the battery to Edwin A. Stevens, the United States must have made a mistake when they left him only an equal share with the others; and even admitting, for the sake of· the argument, that there was a mistake, it is a mistake of congress, and no court can rectify it.   *Id.; Weatherhead's Lessees* v. *Barkerville,* 11 *How.* 329.

And, says Chief Justice Marshall, in *Rutherford* v. *Greene,* 2 *Wheat.* 196: "No general terms intended for property, to which they may be fairly applicable and not particularly applied by the legislature; no silent, implied and constructive repeals ought ever to be so understood as to divest a vested right."

This law, being an appropriation of money, was read three times, both in the senate and house of representatives, and printed four or five times in the *Congressional Globe.* Would not, therefore, any mistake have been discovered, if it had existed.

In *Den.* v. *Reid,* 10 *Pet.* 527, Judge McLean says: "But it is not for the court to say, where the language of the statute is clear, that it shall be so construed as to embrace cases, because no good reason can be assigned why they were not excluded from its provisions.   We are unable to say why the benefit of this statute was given to those who held under deeds proved by the subscribing witnesses, and withheld from those whose deeds were proved by the acknowledgment of the grantor.   In most cases, if not in all, proof by acknowledgment would be deemed more satisfactory than by witnesses; but the legislature having made a distinction between the cases, whether it was intentional or not, reasonable or unreasonable, the court are bound by the clearly expressed language of the act."   To the same effect, *Benton* v. *Wickwire,* 54 *N. Y.* 226.

To claim that this resolution means only one person, the term "heirs at law" must be altered to "heir at law," and "their legal representatives" to "his legal representative." And, says Blackstone: "An act of parliament cannot be altered, amended, dispensed with, suspended or repealed but in the same forms, and by the same authority of parliament; for it is a maxim in law, that it requires the same strength to dissolve as to create an obligation." *Book* 1, *p.* 185. And the same reasoning applies to an act of congress.

Such a claim takes property away from twelve persons and gives it to one individual, in direct violation of the constitution of the United States. *5th Amendment.*

"Legislative grants may convey lands without making use of technical words required in a deed." *Rutherford* v. *Greene*, 2 *Wheat.* 196.

After changing the words "heirs or their legal representatives" from the plural to the singular, it is further claimed that it must be altered to "legatee"; and as Robert L. Stevens left several legacies, the name of the particular legatee would also have to be mentioned for him to take the whole gift; "but as (congress has) constituted the writing to be the only outward and visible expression of their meaning, no other words are to be added to it or substituted in its stead." 1 *Greenl. Evid.* 386, § 277; *Gibbons* v. *Ogden*, 3 *Hal.* 295.

"The assigned reason may aid in the construction of doubtful words, but cannot warrant the rejection of words that are clear." *Wms. on Ex'rs*, 933.

The term "heirs at law or their legal representatives," is not uncertain, for the law points them all out, and they are all named in this bill (*p.* 92). And Chief Justice Marshall says, in *Hunt* v. *Wickliffe*, 2 *Pet.* 201, where this same objection was urged: "We do not think the technical objection to substituting a legal description, which cannot be misunderstood, for the more definite description by the proper names of the persons who are heirs, is of such substantial importance as to vitiate the transaction." In this

Stevens *v.* Shippen.

case the decisions of the United States courts are "final and obligatory." *Greene* v. *Neal's Lessee,* 6 *Pet.* 299. "A grant to the heirs at law of a person deceased is valid." *Comyn Dig., Grant, B.* 1; *Shaw* v. *Land,* 12 *Mass.* 447.

2. It is expressly agreed that this mortgage shall be preferred to all prior mortgages and prior judgments (*Case, p.* 78); and can subsequent judgments or liens be placed in a better position?

The mere statement of these facts is a sufficient answer to the proposition that the moneys expended by the United States, and those spent by Edwin A. Stevens or his executors, on the battery, should be paid in proportion, or *pro rata.*

The case of *Hughes* v. *Edwards,* 9 *Wheat.* 489, decides that a mortgage covers all improvements.

Robert L. Stevens and Edwin A. Stevens, having made efforts " to devise, construct and finish the said vessel" (*Case, pp.* 54, 28, 60) for the government of the United States, and Edwin A. Stevens's executors having spent money for the same purpose, they are answerable for default and failure to carry out the agreement; and all moneys spent by them subsequent to those spent by the government, cannot be preferred to this mortgage. *Ruff* v. *Rinaldo,* 55 *N. Y.* 664.

" The executors and administrators so completely represent their testator or intestate, that every bond or covenant, or contract of the deceased, includes them, although they are not named in the terms of it, for the executors or administrators of every person are implied in himself." *Wms. on Ex'rs* 1465, 1409; *Parsons on Cont.* 110; 2 *Bl. Com.* 243.

" Whatever is the state of liability of the party himself at his death, must be the state of liability to be considered upon questions between those representing him after his death." *Taylor on Prec. of Wills,* 150, 535.

Robert L. Stevens agreed to spend his own money, if necessary, and Edwin A. Stevens spent his money on a battery of his own. (*Case, pp.* 80, 173.)

4. The law of July 1st, 1870, is not inconsistent with the resolution of July 17th, 1862, for it was simply enacted to clear up doubts which had been suggested as to the right of the state of New Jersey receiving a ship-of-war in time of peace, under Article 1, § 10, of the constitution of the United States. (*Case, p.* 33.)

It does not pretend to decide that the state takes anything, for the body of the act is in these words : " That the consent of congress is hereby given that the state of New Jersey shall receive and dispose of the said ship, according to the terms and conditions of said bequest;" and it seems absurd to argue that it means a gift of the battery by the United States to the state of New Jersey, especially when the preamble contains these words: "the United States having previously relinquished all claim to said ship."

The fact that the preamble states that " Edwin A. Stevens was, in his life-time, owner of the ship," means part owner. Or else it might as well be argued, from the words following, " large sums of money were spent by his brother and himself," that not a cent was spent by the United States; whereas the contrary is admitted by all the parties to this suit.

To make this resolution mean a gift, it would have to be altered even more than the resolution of July 17th, 1862, if changed to mean a particular legatee.

5. Have any of the heirs at law been guilty of laches ? Says Chief Justice Parsons, in *Stoughton* v. *Baker & Vose*, 4 *Mass.* 522: " No laches can be imputed against the government, and against it no time runs so as to bar rights." And " *nullum tempus occurrit regi*," applies to the government. *Gilbert* v. *People*, 18 *Johns.* 227; 4 *Bac. Abr.* 461; *People* v. *Supervisors of Columbia*, 10 *Wend.* 363; 4 *N. Y.* 508. Nor against the five non-resident heirs. *Stat. of N. J. ch.* 8, (*Title IV.*) § 8.

The rights of the United States were not given to the heirs at law until July 17th, 1862, and this bill was filed December 21st, 1868, thus leaving only about five years and

Stevens *v.* Shippen.

a half to impute laches to any of the heirs, instead of sixteen, under this sealed instrument.

But even admitting laches could be imputed to the United States, the last payment was made under this sealed contract, December 14th, 1855, and Edwin A. Stevens and his executor have been endeavoring to complete it ever since. (*Case, pp.* 28, 54, 60.)

" When a purchaser goes into possession, the vendor is his trustee for the title, and his *cestui que trust* for the purchase money; and in this case the court enforced both trusts after the lapse of twenty years." *Boone* v. *Chiles,* 10 *Pet.* 177.

" Mere lapse of time constitutes of itself no bar to the enforcement of a subsisting trust." *Oliver* v. *Piat,* 3 *How.* 411; *Michoud* v. *Girod,* 4 *How.* 561; *Provost* v. *Gratz,* 6 *Wheat.* 497.

" Both the mortgagor and the mortgagee are treated in equity as trustees, and neither will be permitted, while in the possession of the estate, to do any act which will essentially injure the rights of the other party." *Willard's Eq. Juris.* 447.

" If a mortgage is duly recorded, it is not laches for the mortgagee to be silent concerning it; and he is not thereby precluded from asserting it against a purchaser without actual notice." *Dick* v. *Balch,* 8 *Pet.* 30.

In this case the mortgage was part of the contract, and recorded; and it is notice to all the world.

The executors admit themselves to be trustees (*Case, p.* 59); and desire, if a sale takes place, that the rights of none of the parties shall be injured. (*Case, p.* 70.) 2 *Greenl. Evid.* 387.

There can be no laches in waiting while a contract is being executed. (*Case, p.* 28, *&c.*) 7 *Johns. Ch.* 134.

This mortgage was not to be cancelled and returned until the contract was faithfully performed. (*Case, p.* 81.)

6. This is a gift to the heirs as joint-tenants, and to a class as such.

This is a gift to all the heirs as joint-tenants, and embraces the unities of title, time, interest and possession, necessary to constitute such a tenancy. 2 *Bl. Com.* 180, *and note* 3, *by Sharswood ; Putnam* v. *Putnam,* 4 *Bradf.* 308.

In *Dick* v. *Lacy,* 8 *Beav.* 214, there was a gift, in a will, to Lady M. for life, with remainder to her nieces, the daughters of B.; and it was held by Lord Langdale, M. R., that the nieces took absolute interests and in joint-tenancy.

Chancellor Walworth says, in *Hannan* v. *Osborn,* 4 *Paige,* 341: " By the common law, a devise to a man and his children, as an immediate gift to both, was held to be a devise to the parent and his children jointly. If there were children in existence at the time, it was held they took jointly with the parent."

This is a gift to a class without naming them ; and, " A gift to a class (without naming them) implies an intention to benefit those who constitute the class, and to exclude all others ; but a gift to individuals, described by their several names and descriptions, though they may together constitute a class, implies an intention to benefit the individuals named." *Lord Cottenham in Barber* v. *Barber,* 3 *Myl. & Cr.* 688.

A gift to the testator's three sisters, *or* their children, was held to be a gift to the whole class of the daughters and the children equally. *Wms. on Ex'rs* 1221.

The statute of 1812 (*Rev. Stat.* 650), making all joint-tenancies, tenancies in common, applies only to real estate. See *Putnam* v. *Putnam, supra,* where a similar act was passed in the state of New York. The word " estate " in the act means " Estate—that title or interest which a man hath in lands or tenements." *Jacobs's Law Dict.; Tomlin's Law Dict.*

Lord Coke says : " Estate signifies such inheritance, freehold, term of years, tenancy by statute merchant, staple, elegit, or the like, as any man hath in lands or tenements." *Co. Lit.,* § 650, 345 *a.*

7. The gift is to the state of New Jersey *when* finished. (*Case, p.* 9.)

(*a*) " The terms, ' if,' ' when,' ' in case,' or ' provided '—
these expressions annex the time to the substance of the
legacy, and make the legatee's right depend upon his being
alive at the time fixed for its payment."   " The only excep-
tion is where the person takes the intermediate interest."
*Wms. on Ex'rs* 1052, 1060, 1058; *Paterson* v. *Ellis*, 11 *Wend.*
259.

" And if a contingent legacy be left to one, as *when* he
attains, or *if* he attains, the age of twenty-one, and he dies
before that time, it is a lapsed legacy."   2 *Bl. Com.* 513.

(*b*)  The million dollars was not sufficient to finish the battery.

" The impracticability of the performance will be a bar to
the claim of the legatee."   *Wms. on Ex'rs* 1086.   In *Wil-
lard's Eq.* 525, it is stated: " But in all cases of personal
legacies, where there is a devise over, whether the condition
be precedent or subsequent, the right of the devisee over
will prevail against that of the legatee, if the condition be
not performed."

(*c*) If the gift ever took effect, it was upon the death of
Edwin A. Stevens, August 7th, 1868, and the *consent* of
congress was not given until July 1st, 1870.

If the state could take the battery for nearly two years,
without the consent of congress, why not for fifty years ?

" In the instances of conditions requiring marriage with
*consent* of executors or trustees, it has been decided that such
consent must be obtained before or at the marriage ; for a
subsequent approbation, by the executors, etc., will not be
a performance of the condition."   *Wms. on Ex'rs* 1097.

8. Is the legacy to the state of New Jersey a specific
legacy ?

This is a specific legacy, the Stevens Battery, and " can
only be satisfied by the delivery of the identical subject."
*Wms. on Ex'rs* 994; *Dayton on Surr.* 384 ; *Toucht.* 433.

" The ordinary criterion of a specific bequest is, that it is
liable to ademption."   *Wms. on Ex'rs* 1001.

" The word ' ademption,' when applied to specific lega-
cies, of stock or of money, or securities for money, must be

considered as synonymous with the word ' extinction.' For it should be observed that if stock, securities, or money so bequeathed, be sold or disposed of, there is a complete extinction of the subject, and nothing remains to which the words of the will can apply" (3 *Bro. C. C.* 432, *ed. by Belt*); for, if the proceeds from such sale or disposition were to be substituted and permitted to pass, the effect would be (as expressed by a learned judge) to convert a specific into a general legacy. 9 *Ves.* 360; *Taylor on Prec. of Wills* 52. The same reasoning applies to goods, etc. *Id.* 58.

In *Green* v. *Simonds* (1 *Bro. C. C.* 129, *in note*) the testator bequeathed to C all his books at his chambers in the temple; he afterwards removed his books into the country, and the act was held to extinguish the legacy.

So, also, in *Haseltine* v. *Haseltine*, 3 *Madd.* 276, the bequest was of all the testator's household goods, plate, linen and china, and all the wine and other liquors, goods and chattels whatsoever, which should be in or about his dwelling-house at B and C at the time of his death; and also his coach and other carriages, with his horses and all his live stock at C. After this the testator took a house in D, and removed to it the *greater* part of his furniture from his house at B. This removal was adjudged to be an ademption. Also, to the same effect, *Colleton* v. *Garth*, 6 *Sim.* 19.

The bequest is of the Stevens Battery, a specific thing, and it cannot be cut into sections, and one of them given to the state of New Jersey, if Edwin A. Stevens did not own the whole, but only one-twelfth with the other heirs.

If it must be sold, and one-twelfth of the proceeds given to the state, that would be converting a specific into a general legacy.

9. The interest of the United States, at the time of this gift, was simply a debt, secured by a mortgage, and by the above provision in the contract as to ownership ( *Case, p.* 56 ); because Robert L. Stevens had failed to deliver the vessel as agreed ( *Case, p.* 87).

Stevens *v.* Shippen.

In an analogous case, Judge Sutherland says: "The plaintiff paid his money on account of a contract for the purchase of the brig of the defendant and her other owners. The consideration, therefore, failed, and he is entitled to receive it back." *Murray* v. *Richards*, 1 *Wend.* 58.

In 25 *N. Y.* 277, Judge Davies says: "The only additional case needful to refer to, is that of *Trustees of Trenton* v. *Bennett* (3 *Dutch. N. J.* 514). In that case, a person had contracted with the owner of a lot to build, erect and complete a building thereon, and, by reason of a latent defect in the soil, the building fell down before it was completed, and the supreme court of New Jersey held that the loss fell upon the contractor, and that when the contract was, by its terms, to build and complete a building and find materials, for a certain entire price, payable in instalments as the work progresses, the contract is entire, and if the building, either by fault of the builder or by inevitable accident, is destroyed before completion, the owner may recover back the instalments he has paid." To the same effect, 19 *Pick.* 275; 25 *Conn.* 530; *Harmony* v. *Bingham*, 2 *Kern.* 99; *Cox* v. *Prentice*, 3 *M. & S.* 344; *Cocks* v. *Marterman*, 9 *B. & C.* 902; 3 *Comst.* 237; *Giles* v. *Edwards*, 7 *Term* 181; 5 *East* 449; 1 *Hill* 287; 2 *Burr.* 1009; *Comyn on Cont.* (1 *Am. ed.*) p. 298.

10. The executors of Edwin A. Stevens, having converted to their own use the property of the other heirs, by taking possession of the battery and threatening to sell it, and by selling some of the machinery and placing some in the "Stevens Institute" (*Case, pp.* 36, 57, 129), must also account for the value of said property.

Judge Davies says, in *Boyce* v. *Brockway*, 31 *N. Y.* 493: "A wrongful intent is not an essential element of the conversion. It is enough in this action that the rightful owner has been deprived of his property by some unauthorized act of another assuming dominion or control over it."

In *Suydam* v. *Jenkins*, 2 *Sandf. Ch.* 622: "He must, in all cases, be compelled to refund. Hence he must, in all cases,

be liable to the extent of the value of the property when taken or converted, together with interest, even when the amount may greatly exceed the sum that would be sufficient to indemnify the owner." *Van Horn* v. *Fonda,* 5 *Johns. Ch.* 407 ; 2 *Sumn.* 524. " The mere sale by one tenant of the entire chattel, is a conversion. *White* v. *Osborn,* 21 *Wend.* 72.

*Mr. Joel Parker,* for the state.

The subject matter of the controversy is the ownership of an unfinished vessel, known as the "Stevens Battery."

The vessel is claimed by three parties.

I. By the brothers and sisters of Robert L. Stevens, deceased.

II. By the residuary legatees of Edwin A. Stevens.

III. By the state of New Jersey, under will of Edwin A. Stevens.

I. The brothers and sisters of Robert L. Stevens claim by virtue of a joint resolution of congress of the United States, passed July 17th, 1862, entitled "A resolution *releasing* to the heirs at law of Robert L. Stevens the right, title and interest of the United States in and to the Stevens Battery. "

This claim cannot be maintained successfully. First, because the United States never had any title to the vessel, and could not pass any right to others. Second, because, even if the United States had any title, the joint resolution did not vest it in the brothers and sisters of Robert L. Stevens.

The vessel was, in part, built with funds of the United States, but it was never delivered to the government.

The government held a mortgage on valuable property of Robert L. Stevens (not including the battery), to secure delivery of battery, but it was never delivered.

The remedy of the United States is under the mortgage ; but the title never passed to the United States government, and, therefore, the resolution could pass no right in the vessel to the brothers and sisters of Robert L. Stevens.

But, supposing the United States, at the time of the passage of the resolution, did have a right in the vessel: that resolution gave all the title of the United States, not to the brothers and sisters of Robert L. Stevens, but to the residuary legatee of Robert L. Stevens, to wit, Edwin A. Stevens.

(a) The word "heirs," under which the brothers and sisters of Robert L. Stevens claim, is not an appropriate term in relation to personal property.

The statute must be so construed as to ascertain the intention in the use of the words.  Ogden v. Strong, 2 Paine C. C. 584; Foster v. Blythe, 2 Cranch 386; Lawn v. Guild, 1 Gall. 485; Dwarris on Stat. 144, 278, 179, 183, note 5, 201–2; 2 Vattel, ch. 17, p. 285; Brown v. Wright, 1 Gr. 240, 241; Holmes v. Earley, 31 N. Y. 290; Chase v. N. Y. C. R. R., 26 N. Y. 523; People v. Utica Ins. Co., 15 Johns. 358.

Words are not always taken in their strict sense, but governed by subject-matter.  2 Redfield, on Wills, (Ed. of 1866,) 337, 339, 354; 4 Ves. 437, 692, 698; 2 Story Eq. Juris. §§ 1065, 1067; 2 Metc. (Ky.) 466.

The intention of the resolution was to give the vessel to the beneficiary of Robert L. Stevens, under his will, to wit, his residuary legatee, Edwin A. Stevens, and the word "heirs" will be so construed.  Stevens v. Bagewell, 15 Ves. 139, 151.

The word "release," in the resolution, implies the granting of right to one who already had some right.

Robert L. Stevens's will had bequeathed the battery to Edwin A. Stevens, and not to his brothers and sisters, and he was the beneficiary.

What claim had the brothers and sisters of Robert L. Stevens on the bounty of the government?

Robert L. Stevens, in his life-time, had claim to bounty of the government, for he had expended a large amount of his own money on the battery.   After his death the person to whom he bequeathed the battery, and not his brothers and sisters, had claim on the bounty of the government.

The case of *Stevens* v. *Bagewell*, 15 *Ves.* 139, decides that, in an award of prize-money by the government, after the death of the person who was entitled, the word "representatives" is construed to be "residuary legatees;" that it was constructively the property of Lieutenant Stevens (who took the prize) at the time of his death, and should go as his will directed.

The word "heirs" is sometimes used for "legatees." 3 *Ohio* 375.

(*b*) Again, the action of those interested and their universal acquiescence in the well-understood meaning of the resolution at the time, will prevail as a practical application of the words. *Cavasos* v. *Trevino*, 6 *Wall.* 773; *R. R.* v. *Co. Trimble*, 10 *Wall.* 367; *Noonan* v. *Bradley*, 9 *Wall.* 394; 2 *L. R. Scotch and Divorce Appeals, House of Lords*, 215, 216; *Ship Recorder*, 1 *Blatch. C. C.* 218; *Packard* v. *Richardson*, 17 *Mass.* 122; *Dwarris on Stat.* 693; 5 *Bac. Abridg.*; 3 *Pick.* 517; 1 *Cranch* 299; 5 *Cranch* 22; 2 *Mass.* 477; *Edwards* v. *Derby*, 12 *Wheat.* 210.

The construction at the time (which was acquiesced in) was, that after the death of Robert L. Stevens, and even after the resolution of congress, the vessel belonged to Edwin A. Stevens.

Edwin A. Stevens and his executors, after the passage of this resolution, publicly expended over a million dollars of the money of Edwin A. Stevens and his estate, on the battery, in the presence and knowledge of claimants, without objection.

In 1870, congress passed another resolution, which referred to the vessel as having been the property of Edwin A. Stevens, which he had given to the state of New Jersey. If the resolution of 1862 was intended to give the vessel to the brothers and sisters, they never accepted the gift, and the resolution of 1870 revoked it. 2 *Kent* 439.

From the foregoing it will be seen that the title of the vessel, after death of Robert L. Stevens, up to the death of Edwin A. Stevens, was in Edwin A. Stevens.

II. The remaining question is : To whom did Edwin A. Stevens bequeath the battery ?

The widow and children of Edwin A. Stevens insist that it goes to them under the residuary clause of Edwin A. Stevens's will. The state of New Jersey insists that the will vests the battery absolutely in the state. The following are the terms of the bequest, viz. :

"Out of the residue of my estate, &c., I empower my executors to apply not exceeding the sum of one million dollars, to finish, on my general plans, as near as may be, in the discretion of my executors, the battery known as the Stevens Battery; and, for the accomplishment of the said object, I give to them the use of the dock and yards and basin heretofore appropriated to the said battery, and all the material pro- vided for said battery. When said battery shall be finished, I direct my executors to offer the same to the state of New Jersey, as a pres- ent, to be disposed of as said state shall deem proper; and if not accepted by said state, I direct my executors to sell the same, and the proceeds thereof shall fall into the residue of my estate."

This is claimed to be a conditional bequest, depending on the condition of the vessel being finished for a million. The state contends that by the will of Edwin A. Stevens the battery vested in New Jersey, by the direction to offer it to the state, whether offered or not.

If a testator should, in his will, *desire* his executor to give to a particular person a certain sum of money, it would be construed to be a legacy, although left to the discretion of the executor how and when. 2 *Story's Eq. Juris.* § 1068. Mere recommendatory requests of testator create a vested legacy of personalty. *Brest* v. *Offley,* 1 *Ch.* 246 ; *Hardy* v. *Glen,* 1 *Atk.* 469 ; *Malim* v. *Keighley,* 2 *Ves.* 333 ; *Brown* v. *Higgs,* 8 *Ves.* 570 ; *Knight* v. *Knight,* 3 *Beav.* 148, 172. Even recommendatory words, expressions of hope, or "testator has no doubt," are imperative, if the property be certain and the object certain. *Paul* v. *Compton,* 8 *Ves.* 380 ; *Brown* v. *Higgs,* 8 *Ves.* 573 ; *Dashwood* v. *Peyton,* 18 *Ves.* 41. The direction to offer to the state was a gift to the state. It is said the legacy is contingent, because the vessel could

34

not be finished for a million; but there was no such condition—the only condition being, *if the state would accept.*

Language of wills is construed so as to favor vesting of all the estates attempted to be created. 2 *Redfield, pp.* 595, 599, 630, 631; *Pearsall* v. *Simpson,* 15 *Ves.* 29; *Leath* v. *Robbins,* 2 *Mer.* 363; *Leaming* v. *Shenett,* 2 *Hare* 14, 21; *Smith's Appeal,* 23 *Pa. St.* 9; 30 *Pa. St.* 175; 1 *Jarman* (*ed. of* 1859) 758, *note*; 41 *N. H.* 202; 1 *Bradf.* 154, 179; 2 *Barb. Sup. Ct.* 457; 11 *Wend.* 259; 20 *Wend.* 564.

The will leaves one million of dollars to be expended for the benefit of the state, and this proves it must have been the intention to give the battery itself, unconditionally, to the state.

Where a specific interest is given to a donee in the meantime, it is evidence that testator intended to give the *corpus,* but only deferred the time of coming into possession. 1 *Jarman* (*ed.* 1861) 802; *Cane* v. *Cane,* 2 *Vern.* 508; *Stapleton* v. *Cheele,* 2 *Vern.* 673; 3 *Atk.* 645; *Collins* v. *Metcalfe,* 1 *Vern.* 462; *Green* v. *Pigot,* 1 *Brown C. C.* 103; *Walcot* v. *Hall,* 2 *Brown C. C.* 305; 3 *Brown C. C.* 404, 416, 673.

The executors were to expend one million for the benefit of the state, but the battery vested in the state whether that money was expended on it or not, for the state could have waived that expenditure. The will gives the battery to the state in its then condition, *and, also,* the right to its improvement by the expenditure of a million of the money of the estate. This does not defer the vesting of the legacy. 1 *Redfield* 613; *Stretch* v. *Watkins,* 1 *Mass.* 253; *Blease* v. *Bough,* 2 *Beav.* 221; *Josselyn* v. *Josselyn,* 9 *Sim.* 63; *Oppenheim* v. *Henry,* 10 *Hare* 441; *Lane* v. *Goudge,* 9 *Ves.* 225.

When a legacy is placed in the hands of trustees for the exclusive benefit of the legatee, until directed to be paid over, the legacy will be deemed vested. *Gifford* v. *Thorn,* 1 *Stock.* 708. If, in the meantime, the fund is to be employed for the benefit of the person who is to take possession, (the whole interest, in some way, having been given to that person,) it could not be intended to make it contingent whether

Stevens *v.* Shippen.

that person should have the absolute interest.  *Lane* v. *Goudge*, 9 *Ves.* 230; *Gifford* v. *Thorn*, 1 *Stock.* 708.

There is no other disposition of the vessel by the will, if not finished for a million dollars.

The true construction of the will of Edwin A. Stevens is, that it gives the battery, absolutely, to the state, and, in addition, sets apart one million dollars to be expended upon it.  The conclusion is, that the state of New Jersey has the absolute and unqualified ownership of the vessel.

THE CHANCELLOR.

The questions presented for consideration on the hearing were, whether, under the resolution of congress, approved by the president July 17th, 1862, which, by its terms, released and conveyed the unfinished vessel known as the " Stevens Battery " to the " heirs at law of Robert L. Stevens, deceased, or their legal representatives," the title to that vessel passed to those heirs at law or their legal representatives, or to Edwin A. Stevens as his residuary legatee; and, if the title passed to Edwin A. Stevens as such legatee, whether the gift of that vessel to the state of New Jersey, in and by the codicil to his will, was absolute or conditional, and the questions, whether the charitable gifts in the codicil are valid, and whether the birth of a child of the testator, after the making of the codicil, was a revocation of the devise of Castle Point and the testator's homestead property therein.

Edwin A. Stevens died in August, 1868.  He left a will and a codicil thereto.  The former is dated August 5th, 1865, and the latter April 15th, 1867.  By the will, he gave all his property, after the payment of his debts and funeral expenses, to his wife and the children which he then had— John, Edwin, Robert, Mary, Julia and Carolina.  By the codicil, he gives to his son Albert $100,000, to put him on an equality with the rest of the testator's children, to each of whom he had, by the will, given the like sum.  He adds that it is his will that every child he should thereafter have

should also be upon a like equality with the children which he had at that time, and that each child that might thereafter be born should be entitled to a like sum out of his estate.   He gives to his wife for life his residence known as Castle Point and the homestead lot, and the houses thereon. He then directs his executors to divide Castle Point and the homestead lot, and the houses thereon, into four convenient plots, not necessarily of equal value, and directs that his wife shall .determine which one of his sons shall have the plot on which the mansion-house stands, and directs that the executors set off the other three plots to his other three sons; and adds that the estáte of his sons in their respective plots shall be a fee simple.   He then directs his executors to purchase of the Hoboken Land and Improvement Company, and cause to be conveyed to his wife Martha B. Stevens, William W. Shippen and Samuel B. Dod, and to their heirs and assigns forever, to hold as joint-tenants and not as tenants in common, in trust, two school-house lots in Garden street, Hoboken, owned by them, as they were then fenced in, and the school-houses thereon, and all of the furniture and property of that company on those lots or in those school-houses; and gives to them, to be held in like manner, all his own right, title and interest in those lots, houses and property.   The trust declared is to permit the city authorities of Hoboken (or such other authorities as shall at any time have the legal power over the common schools in the boundaries of that city, as those boundaries then were, and which were then possessed by the · city authorities of Hoboken) to use and occupy the property for the purposes to which they had been theretofore devoted, viz., to no other use or purpose than the furnishing there a free, plain and practical English education to such of the children resident within those boundaries, from time to time, as said authorities shall permit to go there for said purposes.   He further gives to his wife and Messrs. Shippen and Dod, and to their heirs and assigns forever, to hold as joint-tenants and not as tenants in common, in trust, as

Stevens *v.* Shippen.

thereinafter declared, a block of land in Hoboken (except-
ing such interests therein, if any, as he might not own at
the time of his death) and $150,000 in stock and railroad
bonds, in trust, to erect, out of the proceeds of the personal
property, upon that land, within two years after his death,
a building or buildings suitable for the uses of an institution
of learning, which he directs his acting trustee or trustees
for the time being to establish there: they to employ, pay
and discharge at discretion the officers, tutors and servants
thereof, and forever to manage and control it at his, her or
their discretion, but for the benefit, tuition and advance-
ment in learning of youth residing from time to time there-
after within this state; the acting trustee or trustees for the
time being, however, to decide, from time to time, who of
said youth shall receive the benefit thereof, and to direct the
tuition in the institution, and to make all proper by-laws,
rules and regulations for the management of the officers,
tutors, servants and scholars connected with the institution;
the tuition, however, is not to be wholly free, except to such
youth as the acting trustee or trustees shall direct; and, on
the other hand, the cost of tuition of any youth is not to be
wholly paid by him or her—the proportion of payment by
each youth being left to the discretion of the acting trustee
or trustees.   He also gives to the trustees such sum of
money, not exceeding $500,000, as they in their discretion
may think necessary, to be invested and appropriated for
the perpetual maintenance of the institution.

The testator empowered his executors, out of the residue
of his estate (excluding Castle Point and the homestead lot
and houses thereon) remaining after payment of his debts,
the sum of $800,000 in legacies, and the appropriation of so
much thereof as is necessary for the charitable bequests and
devises, to apply not exceeding the sum of $1,000,000 to
finish, on his general plans, as nearly as may be, in the dis-
cretion of his executors, the battery known as the Stevens
Battery, and for the accomplishment of that object he gave
to them the use of the dock and yards and basin theretofore

appropriated to the battery, and all the material provided for it. He further directed as follows: "When said battery shall be finished, I direct my executors to offer the same to the state of New Jersey as a present, to be disposed of as the said state shall deem proper; and if not accepted by the said state, I direct my executors to sell the same, and the proceeds thereof shall fall into the residue of my estate." The testator subsequently gives the rest and residue of his estate, both real and personal, whatsoever and wheresoever the same may be, subject to the devises and bequests in the codicil, and of course excepting Castle Point and the homestead lot, and the houses thereon, to his wife and children, born and to be born; each of his sons to have two shares, his wife two shares, and each of his daughters one share.

The testator's son Richard was born after the making of the codicil.

The executors are Mrs. Stevens and Messrs. Shippen and Dod.

The original bill was filed by Mrs. Stevens on the 23d of December, 1868, against Messrs. Shippen and Dod, her co-executors, and the attorney-general of this state, and Mary P. Garnett, a daughter of the testator, as one of the residuary legatees and heirs at law of the testator. It was designed to raise the question as to the validity of the gifts for charitable purposes and of the gift of the battery. One of the objections raised by that bill to the latter was based on the provision of the constitution of the United States, that no state shall, without the consent of congress, keep ships of war in time of peace. The defendants answered the bill, and replication was filed April 21st, 1869. Subsequently congress, by resolution of July 1st, 1870, consented that the state receive and dispose of the battery. On the 11th of September, 1871, Mrs. Stevens and her children filed a supplemental bill against the governor of the state, the commissioners of the state appointed in reference to a sale of the battery, the attorney-general, and Mrs. Lewis, formerly Mrs. Garnett. It stated the death of one of the

complainants in the original bill since the filing thereof, and that Richard Stevens, one of the complainants, the youngest son of the testator, was born after the making of the codicil. It alleged, as an additional objection to the gift of the battery, the impossibility of finishing the vessel, according to the testator's plans, for the sum of $1,000,000. It presented for adjudication by the court the additional questions: Whether the birth of issue after the making of the codicil, although such issue was provided for thereby, was a revocation? How Castle Point and the homestead lot should be divided? Whether the executors had duly executed their trust in reference to the Stevens Institute, and what the executors should do with the school-houses, and how they should execute the trust as to them?

On the 5th of January, 1872, the defendant executors, Messrs. Shippen and Dod, answered, admitting the impossibility of completing the vessel according to the testator's plans with the amount appropriated for that purpose by the codicil. The attorney-general answered, setting up the resolution of congress authorizing the state to receive and dispose of the battery, and insisting on the right of the state to the vessel. On the 12th of April, 1872, the supplemental bill was amended, by making the heirs at law of Robert L. Stevens, deceased, other than the children of Edwin A. Stevens, parties, in view of the fact that they might claim title to the battery under the resolution of congress (approved by the president, July 17th, 1862,) above mentioned, by which all the right, title and interest of the United States to the vessel was released and conveyed to the "heirs at law of Robert L. Stevens, or their legal representatives." Subsequently, the attorney-general filed a cross-bill, or information, praying that the executors might be required to offer the battery to the state, in such condition and stage of or towards completion as this court might deem equitable and just, or that they might be required to finish it out of the moneys appropriated by the codicil; or, if those moneys were not sufficient, then to finish it out of

their own money; that the court would declare that the bequest was not on a contingency, and that the last-mentioned resolution of congress conveyed no title to the heirs at law of Robert L. Stevens, deceased, or their legal representatives. The defendants having answered the information, the cause now comes on for hearing upon the pleadings and the proofs, all of which were taken before the filing of the information.

To consider, first, the questions raised in regard to the bequest of the battery: Robert L. Stevens contracted with the United States government, in 1843, to construct, on his own plan, a shot and shell proof war steamer, for harbor defence, at the price of about $585,000. He proceeded with the work, and, while it was in progress, died. His death occurred in 1856. In 1849, the United States government, which had advanced $500,000 of the price, refused to make any further payment, and the work was therefore suspended; but it was again resumed in 1853, and was continued up to or near the time of Robert L. Stevens's death. At the time of his death he had expended upon the vessel, which was then far from completion, over $113,000 of his own money, besides the amount ($500,000) received from the United States government. By his will, which was dated in 1846, he made his brother, Edwin A. Stevens, his residuary legatee. The latter, and John C. Stevens, were his executors, and duly proved the will. Edwin A. Stevens, however, took principal charge of the administration of the estate. It is not disputed that, if the vessel was part of the estate of Robert L. Stevens, it passed to Edwin A. Stevens, as his residuary legatee. The latter, after Robert L. Stevens's death, being desirous of carrying out the project of his brother, continued the work on the battery, and expended about $100,000 of his own money thereon. In 1861, he solicited the United States government to complete the vessel. A board of examiners was appointed, on the part of the government, to report on the subject, and they, in December, 1861, reported adversely to any further

expenditure by the government upon the vessel. The following resolution was subsequently passed by congress, and was approved by the president of the United States on the 17th of July, 1862:

"A resolution releasing to the heirs at law of Robert L. Stevens, deceased, all the right, title and interest of the United States in and to the Stevens Battery.

"*Resolved,* by the senate and house of representatives of the United States of America, in congress assembled, That all the right, title and interest of the United States in and to the Stevens Battery, be and the same are hereby released and conveyed to the heirs at law of the said Robert L. Stevens, or their legal representatives."

After the passage of that resolution, the work on the vessel was suspended until after the death of Edwin A. Stevens, when, under the direction of the codicil to his will, his executors proceeded with the work with a view to its completion according to his plans, and they had expended of his estate upon it, up to December, 1870, nearly $900,000. Finding, then, that a further sum of from $400,000 to $500,000 (from $300,000 to $400,000 more than the sum they were authorized to expend for the purpose,) would be necessary to complete the battery, they thereupon stopped the work, and have never since resumed it. The fact that Edwin A. Stevens claimed to be the owner of the battery in his life-time was a matter of public notoriety, as was also the fact that by his will he had disposed of it as his property. And yet it does not appear that any adverse claim to it was at any time made by or in behalf of or under any of the heirs at law or next of kin of Robert L. Stevens, until it was set up in this suit, by answer, in April, 1872. The heirs at law, who now claim it adversely, have stood by, and, without even so much as a protest, as far as appears, seen Edwin A. Stevens expend upon it, in his life-time, prior to the passage of the above-mentioned resolution of congress releasing the interest of the United States, about $100,000 of his own money. They have, in like manner, notably done the same thing since then—witnessing, without claim or protest, the

expenditure of nearly a $1,000,000, by his executors, out of his estate, in pursuance of his testamentary direction, which was based on his claim of ownership and consequent right to dispose of the vessel. It is urged, in their behalf, that some of them were under disability, and, therefore, are not estopped by acquiescence; and, further, that the heirs at law, or next of kin, had in fact no claim whatever to the battery until after the approval of the resolution of congress, (July 17th, 1862,) by which the right, title and interest of the United States in it was conveyed and released.

. I do not deem it necessary to consider whether the doctrine of estoppel may be applied in this case. The title to the vessel, up to the time of the approval of the resolution just referred to, was in the United States; and Edwin A. Stevens had, up to that time, acquired no legal title to it under the will of his brother. Under the explanatory agreement, dated November 14th, 1844, between the United States and Robert L. Stevens, for the construction of the vessel, it was provided that all the materials furnished for the vessel, its engines, boilers, and all their dependencies, should be inspected, received and receipted for by an agent appointed by the secretary of the navy, on the part of the United States, and that when so received and receipted for they should be distinctly marked with the letters "U. S.," and should become the property of and belong to the United States, and that payment on account of the contract price should be made on the certificate of that agent as to the cost of the materials and labor. Under this arrangement, the vessel, when completed, and in whatever state before then, was the property of the United States. *Scudder* v. *Calais Steamboat Co.*, 1 *Cliff.* 370, 378. Though the United States government does not appear to have asserted any claim to it, but, rather, to have regarded the enterprise as an entire failure, it does not, on the other hand, appear that there was at any time any necessity or occasion for such assertion.

Robert L. Stevens had, as has been before stated, expended a large amount of his own money upon the vessel. There could be no question as to his entire good faith in all his connection with the enterprise. He was actuated solely by a desire to embody and illustrate his own ideas of naval architecture for the purposes of warfare. Not only was all that was received from the government faithfully expended, but he did not spare his private funds. He had given security for the performance of his contract. The vessel was in his possession up to the time of his death, and, after that, in the possession of Edwin A. Stevens as his residuary legatee. Robert L. Stevens, in his life-time, and his brother, after his death, as his residuary legatee, had an equitable interest (using the term interest not in the technical but in the popular sense) in the vessel. If the vessel had been finished, and had proved to be the impregnable, movable fortress which they appear to have believed she would be, or even a success, they had reason to expect from the bounty, not to say justice, of the government, at least repayment of the private funds expended in its construction.

It is evident, from the language of the resolution, that congress intended only a relinquishment of the title of the government to the property for the benefit, and it will be presumed to have been intended in augmentation of, the estate of Robert L. Stevens. The language is, " the heirs at law of the said Robert L. Stevens, or their legal representatives." There appears to have been no reason why the government should make the heirs at law, rather than the next of kin or residuary legatee of Robert L. Stevens, the recipients of its bounty. In *Stevens* v. *Bagewell*, 15 *Ves.* 139, 152, a warrant of the British treasury ordering payment of prize-money to the " representatives" of a deceased lieutenant of the British navy, was construed to entitle his residuary legatee to it. Said the court: " The captured effects being condemned to the crown, no right to any part of the produce can accrue to any one except by the gift of the crown; and as Lieutenant

Stevens died before any gift was made, his will could have no direct operation upon the subject of that gift. But the intention of the crown, in all cases of this kind, is to put what is in strictness matter of bounty upon the footing of matter of right. * * * * In such cases, the crown never means to exercise any kind of judgment or selection with regard to the persons to be ultimately benefited by the gift. The representatives to whom the crown gives are those who legally sustain that character; but the gift is made in augmentation of the estate, not by way of personal bounty to them. They take subject to the same trusts upon which they would have taken wages, or prize-money, to which the party from whom they claim might have been legally entitled. The representatives of Lieutenant Stevens were, therefore, entitled to receive this money, but upon the same trusts as they would take his general estate; and this is to be considered as if it had been actually a part of his property at the time of his death."

The preamble of the subsequent resolution of congress consenting that this state accept the vessel, is some evidence of the intention of that body in the former resolution. It recites that "Edwin A. Stevens was, in his life-time, the owner of the battery, and that upon the building thereof large sums of money had been spent by him and his brother, and that he had, by his last will and testament, (the United having previously relinquished all claims to the ship,) left it to be finished by his executors," &c., "and, when finished, to be offered to the state of New Jersey as a present," &c. Congress did not intend, by the resolution of 1862, to grant to the heirs at law of Robert L. Stevens, or their legal representatives for their benefit, but merely designed to effect a relinquishment of the interest of the United States in the vessel to those who were entitled to the estate which Robert L. Stevens owned at the time of his death, and the heirs at law, or their legal representatives, will be held to have received title to it in trust for the residuary legatee, to whom, as part of his personal estate, it would have gone

Stevens v. Shippen.

had he had the legal title to it at the time of his decease. Edwin A. Stevens, then, at the the time of his death, had complete title to and ownership of the battery.

The next question to be considered is, as to the character of his bequest thereof in favor of the state. By the codicil the executors are empowered to apply not exceeding $1,000,000 to finish the battery, on the testator's general plans, as nearly as may be, in their discretion, and for the purpose he gives them the use of the dock, and yards and basin theretofore appropriated to its use, and all the material provided for the vessel. The testator adds : " When said battery shall be finished, I direct my executors to offer the same to the state of New Jersey, as a present, to be disposed of as the said state shall deem proper; and if not accepted by the said state, I direct my executors to sell the same, and the proceeds thereof shall fall into the residue of my estate." The battery is only to fall into the residue of his estate in case the state will not accept it. No provision is made in reference to it in any other contingency whatever. The contingency of the inability of the executors to complete the vessel on, or nearly on, the testator's general plans, was not contemplated by him. The gift is to the state, and the direction given to the executors as to the expenditure to be made upon it has reference solely to the condition in which he desired the vessel to be when offered as a present to the state. The direction is to finish the vessel, and then to offer it to the state as a present, to be disposed of as the state shall deem proper. The bequest is, in effect, a gift to the state of the vessel and of the sum of money, not to exceed $1,000,000, which may be necessary to complete it according to his general plans, or nearly so, with provision that the work of completion shall be done, and therefore the requisite expenditure of money be made, by his executors, who are to exercise a certain discretion as to the amount, kind and character of work to be done, (so always, however, that it be in accordance with his general plans, or nearly so,) and as to the expenditure of the money

requisite for that purpose. The legacy of the battery to the state is a vested legacy. There is no gift to the executors, but merely a direction to them to finish the vessel in a certain way, and to offer it, when finished, for acceptance, as a present from him to the state, to be disposed of as the latter shall see fit. The gift to the state is an absolute gift, *in presenti*, and though the delivery is to be *in futuro*, it is in no wise conditional. It is as if a man who was building a carriage, which at his death was not completed, should direct his executors to finish it, and give it, when finished, to a designated person. The title to the carriage would pass to such person without reference to the executors' ability to finish it. The direction to offer the battery to the state, as a present, is a bequest of the vessel to the state. Where a testator expressed in his will his *desire* that his executors should give to another a specified sum of money, without prescribing any time of payment, it was held a good bequest. *Brest* v. *Offley*, 1 *Ch. R.* 246. And, where a testator gave to his wife, among other things, his goods and furniture in his house at the time of his death, and "desired" her, at or before her death, to give the same to and amongst such of his own relations as she should think most deserving and approve of, and she died without making such disposition of them, it was held that she took only a life-estate in the chattels, and that, she having died without disposing of them as directed by the will, they went to her husband's relations, and they were ordered to be divided among his next of kin. *Harding* v. *Glyn*, 1 *Atk.* 469. By the terms of the gift, the battery is to be at the disposal of the state. The gift, therefore, is vested and absolute. 1 *Roper on Legacies* 642. My conclusion is, that the title of the state to the vessel is valid and unconditional.

The gifts for charitable uses and purposes next claim consideration. The devise to the executors as trustees of the school-houses and furniture, and the lots whereon the houses stand, for the sole use and purpose of furnishing there a free, plain and practical English education to such of the

Stevens *v.* Shippen.

children residing within the boundaries of the city of Hoboken, from time to time, as the authorities of that city, or such other authorities as shall at any time have the legal power over the common schools in the boundaries of the city as they existed at the time of the testator's death, shall permit to go there for those purposes, is a valid gift, and a charitable trust is thereby created which this court will recognize. So, too, as to the gifts for what is now known as "The Stevens Institute of Technology." They are for a charitable use. The trust is for the benefit, tuition and advancement in learning of the youth residing from time to time "hereafter" within the state of New Jersey; the acting trustee or trustees from time to time to decide who of said youth shall receive the benefit thereof, and to direct the tuition in the institution, and make all proper by-laws, rules and regulations for the management of the officers, tutors, servants and scholars connected with the institution; the tuition, however, not to be wholly free, except to such youth as the acting trustee or trustees shall direct, but no youth to be required to pay the whole cost of his or her tuition. The trustees have, in accordance with the directions of the codicil, applied to the legislature for an act of incorporation, which has been duly passed (*P. L.* 1870, *p.* 166); and the buildings have been erected. The action of the trustees, in regard to the school-houses and school-house lot and furniture, does not appear to have been in controvention of their duty in the premises.

So, also, of their action in reference to the establishment of the institution of learning for which provision is made by the codicil. It appears that they have considered themselves at liberty, under the terms of their trust, to admit to the benefits of the institution, except so far as reduction of the price of tuition is concerned, pupils not resident in this state. Their construction of the trust is, that the benefits of the institution, to which pupils resident in this state are exclusively entitled, are the advantages of reduction in the price of tuition. That price has

been fixed for such pupils at half the usual rates, but for others full price is charged. That construction is erroneous. The testator provides for the establishment of an institution of learning, to be managed for the "benefit, tuition and advancement in learning of the youth residing from time to time hereafter within the state of New Jersey." The peculiar benefits of the institution are for pupils resident in this state; but the admission of pupils residing elsewhere to participation in the tuition, if such admission be for the benefit of the trust and will not deprive any pupil resident in New Jersey, or any person resident in this state entitled to be and desirous of being a pupil, of any of the advantages secured to him or her by the trust, would not be restrained by this court. The action of the trustees hitherto in admitting pupils not residing in this state to participation in the tuition, on payment of full rates, is therefore not disapproved.

The testator, by the codicil, directed that his executors should divide Castle Point and the homestead lot and the houses thereon, into four convenient plots, not necessarily to be of equal value, and that his wife should determine which of his sons should have the plot on which the mansion-house stands; and that the executors should set off the other three plots to his other three sons, one to each; and that the estate of his sons in their respective plots should be a fee simple.

His son Richard was, as before stated, born after the making of the codicil, and the question is, whether that fact affects the devise in the codicil of the Castle Point and homestead property, which is in favor of the testator's other sons alone. The question arises out of the statutory provision for children born after the making of a will. *Nix. Dig.* 1031, *Wills*, § 21. That section is as follows: "If a testator having no child or children born at the time of making and publishing his last will and testament, shall, at his death, leave a child or children born after the making and publishing of his said last will and testament, or any descendant or

descendants of such after-born child or children, the child or children so after-born, or their descendant or descendants, respectively, if neither provided for by settlement, nor disinherited by the said testator, shall succeed to the same portion of the father's estate as such child or children, or descendants as aforesaid, would have been entitled to if the father had died intestate; towards raising which portion or portions, the devisees and legatees, or their representatives, shall contribute proportionably out of the part devised and bequeathed to them by the same will and testament."

The testator, in the present case, made provision in the codicil for after-born children. After giving to his son, Albert Bayard, who was born after the making and publishing of the will, a sum of money ($100,000) expressly in order to put him upon an equality with his other children, he says: " And my will is that every child I shall hereafter have shall also be upon a like equality with my present children, and each of such children that may hereafter be born shall be entitled to a like sum of $100,000 out of my estate; all of which bequests or devises hereinabove made, and those to my wife and children in the foregoing will of the said sum of $100,000, shall take effect before any other gift in said will or hereinafter made." And again, he gives the residue of his estate to his wife, and his children born and to be born; each of his sons to have two shares, his wife two, and each of his daughters one.

It seems entirely clear that such a case as that which is now under consideration is not within the spirit of the law. It is not within the mischief, and, therefore, is not within the remedy. The legislature surely did not intend to compel a testator to admit an after-born child to an equal share of his property with his other children, under all circumstances, if not provided for by what is technically known as a settlement; for it permits him, absolutely, to disinherit such child, though the child be not provided for by settlement.

By the English law, as it stood when the act was passed, which was in 1824, no presumption of revocation arose from the birth of a child after the making of the will where such child was provided for by settlement. *Ex parte Earl of Ilchester,* 7 *Ves.* 348. And it was said by Lord Ellenborough, in *Kenebel* v. *Scrafton,* 2 *East* 530, 542, that the rule of revocation from marriage and the birth of issue was allowed to apply only in cases where the wife and children, the new objects of duty, were wholly unprovided for, and where there was an entire disposition of the whole estate to their exclusion and prejudice; that is, where there was a total want of provision for the family so newly circumstanced.

The act of 1842 provides, by its first section, for revocation in the case of marriage and birth of issue after the making of a will by a testator who had no issue living at the time of making the will, unless the after-born issue is provided for or mentioned in the will. By its second section, it provides for revocation *pro tanto,* to let in after-born children unless they are provided for by settlement or disinherited. The right of the father to disinherit such children is recognized in both sections. And under the second, where, as in the case under consideration, the testator not only mentions but provides for his after-born children in the will, there will be no revocation. If a testator is, under the act, at liberty, as he undoubtedly is, to disinherit his children born after making his will, he is, of course, at liberty to make an unequal division of his property by will between his children born before making his will and those born afterwards.

The provision contemplated by the second section is not only that made by technical settlement, but includes that which is made by the will itself also. Indeed, it seems, from the reading of both sections together, that the intention of the legislature was, in the cases provided for in both sections, merely to guard against the unintentional exclusion by a testator of those for whom it was his duty to provide; and that the legislature meant to recognize the right

of a testator, in each case, to exclude after-born children, either wholly or partially, from participation in his estate, where his intention to do so was apparent, and to declare that, in case the testator had issue living when he made and published his will and had after-born children not provided for by nor mentioned in the will but provided for by settlement, no presumption of revocation should arise. The birth of Richard, after the making and publishing of the codicil, was not, in law, a revocation of the devise of Castle Point and the homestead property, and he is not to be let in to a share in those properties.